# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-16-00573-CR

**Kathryn L. Preston, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF LLANO COUNTY, 424TH JUDICIAL DISTRICT
### NO. CR7184, HONORABLE EVAN C. STUBBS, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted Kathryn L. Preston of murder, assessing punishment at forty-five years' imprisonment. *See* Tex. Penal Code § 19.02(b)(1). The district court rendered its judgment of conviction consistent with the jury's verdict. On appeal, Preston complains that the district court: (1) did not give the jury an instruction on the use of deadly force in self-defense to prevent the "imminent commission" of kidnapping or murder; (2) did not give the jury an instruction on the presumption of reasonableness for a person's belief that use of deadly force is immediately necessary; (3) included an instruction in the charge stating that self-defense requires more than verbal provocation; (4) denied an additional instruction as to the State's burden to disprove self-defense; (5) admitted blood-spatter testimony from a Texas Ranger that she contends was speculative; and (6) admitted two autopsy photographs that she contends were cumulative and more prejudicial than probative. We will affirm the judgment of conviction.

## BACKGROUND

**Preston's statements to 911 and first responders**

Preston's conviction for the murder of Jose Mario Hernandez[1] arose from a series of events that occurred the afternoon before she called Llano County 911 to report a fire at her house. In the 911 call played for the jury, Preston states that she thinks she will need some help, that she has a fire in her house, and that "somebody better hurry up, I kinda got a controlled burn going here." The operator states, "We've got 'em going," and asked if everyone was out of the house. Preston said she was inside, and the operator told Preston that she needed to get outside. The operator asked if it was an electrical fire or a grease fire, which Preston denied. When the operator asked what kind of fire it was, Preston stated twice, "I don't know how to answer that." The operator could not understand Preston. Preston repeated, "I said, I don't know how to answer that."

The operator then asked Preston if she felt safe and if something else was going on. Preston stated, "Well, yesterday my husband started beating on me." Preston told the operator that he was there, that he knew she was calling, and that he was inside the house. Preston confirmed that she felt safe, stating, "Oh, yeah, I'm fine." When the dispatcher asked if Preston could go outside, Preston responded that she could and that she had put the fire out herself with a fire extinguisher. Given that response, the operator asked if Preston's husband had started the fire, which Preston denied. The operator asked Preston if she needed EMS or was injured, and Preston said she thought

---

[1] Preston also referred to Hernandez as "Joe" and claimed that he was her common-law husband. Evidence at trial showed that Preston was twenty-three years older than Hernandez, and she testified that she became romantically interested in him as a band booster parent at Llano High School, when his sister and her daughter were classmates. Hernandez moved in with Preston approximately two-and-half years before his death.

she might have a fractured bone.[2]  The operator told Preston that if she needed help, she just had to talk to the operator and tell her what she needed.

Preston told the operator, "Well, he fell and hit his head on a rock."  The operator asked, "Just now?"  Preston answered, "No, yesterday."  Preston again stated that her husband was still in the house and that he had physically abused her the day before.  When asked if she was just now able to call, Preston said, "Well, I don't know, I've just been—I've got kids. . . .  And I think I just—I didn't know what to do and so I just kinda forgot about it."  The operator asked if the kids were there or if they had gone to school, and Preston confirmed that they were at school.  Shortly afterward, an officer arrived, and the 911 call ended.

Llano County paramedic James Woods testified he was dispatched to assist the fire department for what they thought was a kitchen fire.  After arriving at Preston's residence and going inside the house, Woods saw a man whose body was partially burned.  Woods confirmed that the man had no pulse and was deceased.  Woods also checked on Preston's physical condition.  He noted bruises on her arms that were not new, but in a healing state.  He attempted to evaluate her further, but Preston told him "she was fine . . . [s]he said she didn't need us."  While he was examining the bruises, Preston asked him to sit and talk with her.

During that conversation, Preston told Woods that "she killed Joe."  Specifically, "she said that she had hit him in the head with a rock" the day before, when the kids were not yet home from school.  Woods testified that there was no question he heard her correctly and that she did not say that Joe fell and hit his head on a rock.  Preston told Woods that she knew Joe was dead.  She

---

[2]  Preston did not specify where on her body she had the reported fracture.

also told Woods that she had stacked some wood in the backyard and that she was going to try to cremate Joe there. Preston further told Woods that she stayed in the room with the dead body overnight.

Woods testified that Preston thought it would be easier to move the body outside, but she was unable to do so because he was too heavy for her. Preston then told Woods that she had filled a Windex bottle with gas and had sprayed Joe with it, trying to soak him in the gas, and that she tried to do the cremation in the house. Preston asked Woods whether he had ever sprayed gasoline out of a Windex bottle, and she talked about the way that the colors reflected and "how cool it looked." Woods testified that Preston said she called 911 because the house began burning when she lit Joe on fire, and she did not want to lose the house. Preston also told Woods that she asked Joe to leave but he was unwilling to do so, that he was abusive to her, and that she was afraid for both herself and her children. Woods testified that Preston followed that statement with a nervous laugh and said, "Well, I guess he's gone now."

Llano County Sheriff's Deputy Kirk Jowers also responded to the 911 call. He testified that he and another deputy arrived at about the same time at Preston's residence in the unincorporated township of Kingsland, located in the eastern part of Llano County, in response to the call about a fire and possible disturbance. Deputy Jowers met Preston in the backyard, where she was sitting on a small rock wall. When he asked her what the problem was, she told him she "was having a bad week, that her husband had been abusive to her." Deputy Jowers asked Preston where her husband was, and Preston said he was on the bedroom floor. Before Deputy Jowers entered the house, Preston told him that her husband had "hit his head on a rock."

4

Both deputies entered the house and encountered heavy smoke, making it hard to breathe and obscuring their view so much that they had to use flashlights to make their way from the hallway to the bedroom. The deputies entered the bedroom and saw the body of a male on the floor, smoldering. When Deputy Jowers shined his light on the man, he noticed a wound on the right side of the man's forehead and was "pretty sure he was deceased." Deputy Jowers also noticed a large stone, like a precast cement landscaping stone or brick, alongside the left leg of the deceased. The deputies were unable to stay in the house because it was difficult to breathe and their eyes were stinging. The deputies walked outside the house, and because Preston was considered a homicide suspect, she was handcuffed and read her *Miranda* rights. Deputy Jowers saw a handwritten note or letter near Preston and placed it into an evidence bag. Preston told Deputy Jowers that it was "a log of everything that had happened to her that week." Deputy Jowers testified that two volunteer firefighters arrived and entered the house where they found a smoldering area on the body that had to be carefully extinguished with a small amount of water to prevent contamination of the crime scene. Exhaust fans were used to clear the smoke from the house.

While at the scene, Deputy Jowers saw Woods examining Preston's arm and overheard her telling Woods that she "tried to drag the body outside to put it in a pile of sticks and make a funeral [pyre] and burn him outside." Deputy Jowers also overheard Preston tell the other deputy that the deceased had been dead since 4:00 p.m. the day before. Deputy Jowers transported Preston to the Llano County Jail, where other officers interviewed her. Deputy Jowers testified that the case was turned over to the Texas Rangers, who conducted a homicide investigation.

**Texas Rangers' investigation of crime scene**

Texas Rangers Jason Bobo and Patrick Pena responded to Preston's residence, got some preliminary information, and obtained a search warrant for the residence and curtilage. As part of their investigation, Rangers Bobo and Pena took photographs and collected evidence from the house. From inside a washing machine, Ranger Bobo retrieved a pillow still inside its pillow case, a decorative pillow, and several items of clothing that were not wet. Ranger Bobo estimated that he found these items at about 2:00 p.m., approximately 22 hours after Hernandez was killed.

Ranger Bobo testified that he had received specialized training in blood-spatter analysis. Based on his training and experience in blood spatter, Ranger Bobo stated that a foam mattress topper found in one of the outbuildings had been removed from the mattress in the bedroom and slid through a deposit of blood as it was moved off the bed, causing a smear through the blood on a bedroom window. After conducting his forensic investigation and examining all of the blood spatter evidence at the crime scene, Ranger Bobo concluded that Hernandez was lying face-up on the mattress in the bedroom when he was struck in the head with the rock. Examination of Hernandez's hands and forearms showed no sign of defensive wounds.

Ranger Pena testified that the items he found during his investigation of Preston's house included a spray bottle containing a yellowish liquid with the odor of gasoline, several cut-up pieces of duct tape, and cellular telephones belonging to Preston and her 16-year-old son, Griffin Preston.[3] On the phones, Ranger Pena saw several text messages from Preston to Griffin, asking him to call her, stating that she needed for him to call her as soon as he could, and stating that she needed

---

[3] For clarity, we refer to Griffin Preston by his first name or as Preston's son.

to know what time he would be home. The texts spanned from 5:44 p.m. to 8:06 p.m. on the day Hernandez was killed. Another text message Ranger Pena saw was sent at 11:33 p.m. that day from Griffin to his older sister—who did not live at Preston's house—stating, "If I don't text you or call you tomorrow or the next day, something is wrong." On Preston's phone, Ranger Pena found four photographs of her bruises, taken between 9:04 a.m. and 9:07 a.m. on the day after Hernandez was killed, and shortly before she called 911 to report a fire at 9:22 a.m.

As part of his investigation, Ranger Pena obtained a warrant to take buccal cells from Preston's cheek. He testified that Preston was "very uncooperative and initially refused" to comply, despite being informed of the warrant. Eventually, Ranger Pena did obtain a buccal cell swab from Preston and submitted it to the Texas Department of Public Safety crime lab for analysis. Ranger Pena testified that the bedroom where Hernandez was killed showed no signs of an altercation. He further testified that his examination of the crime scene led him to believe that Hernandez was hit in the head with a rock while lying down asleep in bed, after which Preston moved Hernandez's body off the bed and onto the floor.

**Preston's statements to her son**

Preston's 16-year-old son Griffin testified that the day Hernandez was killed was also the first day of the school year. Griffin had band practice after school and did not arrive home until about 8:00 p.m. that evening. Griffin saw his mother's text messages, which were insistent enough that he sought her out when he arrived home.

Griffin went to his mother's bedroom, and she spoke to him while partially concealed by the bedroom door. She was not crying. She began talking about Hernandez, and she then told

7

Griffin, "I killed Joe." Griffin testified that he moved past her into the bedroom to see for himself. Although there was very little light in the room, Griffin saw the lower half of Hernandez's body, lying on the floor and along his mother's side of the bed. At that time, Hernandez was wearing a long-sleeved shirt, long blue jeans, and work boots, which Griffin acknowledged were not the clothes Hernandez was wearing in the crime-scene photographs.

Griffin left the bedroom after he saw Hernandez's body, and his mother continued to talk to him. Griffin testified that his mother told him that she hit Hernandez in the head with a rock while he was asleep. Griffin further testified that his mother said Hernandez was conscious at some point after being struck with the rock. She said that Hernandez told her something like, "just finish me off," and she smothered him with a pillow. Griffin said that his mother used the comforter to pull Hernandez off of the bed and onto the floor. In his statement to police, Griffin said that his mother was "freaking out" and kept saying something about "going to jail or the death penalty."

Griffin testified that his mother asked him to help her move Hernandez's body. He refused. He was concerned that she wanted to move the body to cover up a murder. Griffin testified that he became fearful for himself and his two younger brothers because he "realized just how dangerous she was." Griffin went to the living room where his younger brothers were watching a movie and stayed there with them all night. The next morning, as he was leaving to catch the school bus, Griffin told his mother that she needed to call the police or he would. In his statement to police, Griffin said that his mother asked him not to say anything to anybody.[4]

---

[4] Preston testified that she had been a court reporter with Burnet County for 18 years and had recorded testimony in criminal district court, but she denied being familiar with how criminal investigations work.

8

**Testing conducted by DPS forensic scientists**

Several DPS forensic scientists testified about the testing conducted on evidence from the crime scene, including Hilary Keenan, a forensic scientist in the latent prints section, and Brent Wayne Watson, a forensic scientist in the DNA section. Keenan testified that she processed pieces of duct tape and electrical tape found at the crime scene, found latent prints acceptable for comparison, compared the latent prints to Preston's known prints, and determined that Preston was the source of the latent prints from the evidence examined. Watson testified that he received multiple items of evidence for testing and comparison with a known sample of Hernandez's blood, a buccal swab from Preston's cheek, and unknown DNA specimens collected from the crime scene.

Watson processed the swab of a possible blood stain taken from the rock. After making comparisons of that DNA profile to the DNA profiles of Preston and Hernandez, Watson determined that Hernandez was the likely source of the DNA found on the rock and that Preston was excluded as a contributor to the DNA profile found on the rock. Watson also processed the knife sharpener found at the crime scene. He found a DNA sample on the wooden handle of the knife sharpener which showed that Hernandez was the likely contributor of that DNA sample and that Preston was excluded as a contributor of that DNA sample. Watson found a mixture of two individuals' DNA on the metal portion of the knife sharpener, but he was unable to determine whether Preston or Hernandez were contributors to that mixture.

Additionally, Watson processed several items from the bedroom, including a swab from the window casing, a swab from the window glass, a swab from the wall behind the mattress, a swab from an electrical tape roll, and a cutting from the apparent blood stain on the foam mattress

9

topper. All of these swabs showed that the DNA sample found was from a single source, excluding Preston as a contributor and with Hernandez as the likely contributor. Watson stated that the processing of a swab from the duct tape showed that the DNA sample found was from a mixture of sources, excluding Preston but with Hernandez and an unknown person as the likely contributors. Watson testified that there was no presence of blood on the test of a fan.

Watson also testified about his DNA testing on the pillow case and items of clothing. He stated that he was unable to locate any blood on the pillow case found in the washing machine. He processed a pair of shorts and determined that the DNA sample found was from a mixture of three sources, with Preston and Hernandez both likely contributors. Another item Watson processed was a tank top with an apparent blood stain, which showed that the DNA sample found was from a single source, excluding Preston as a contributor but with Hernandez as the likely contributor.

**Medical examiner's findings**

Travis County Deputy Chief Medical Examiner Dr. Satish Chundru conducted Hernandez's autopsy, two days after Hernandez's death. Dr. Chundru's examination of the body externally showed a significant wound on the left eyebrow area but no defensive wounds on the body. Dr. Chundru's examination of the internal organs showed pulmonary edema, or fluid, in the lungs, but all other organs appeared normal. Dr. Chundru noted that the head wound involved a severe injury to the scalp and an indentation of the skull requiring a severe blow, but he found no bruising of the brain. He testified that such an injury to the skull could render a person unconscious. Dr. Chundru also testified that his examination of the trachea showed no presence of soot, meaning that Hernandez was not alive when his body was burned.

10

Dr. Chundru stated that his original determination of the cause of death was homicidal violence, including blunt force head injury. However, after receiving additional information about Hernandez's possible asphyxiation with a pillow, Dr. Chundru opined that the cause of Hernandez's death, based on a reasonable degree of medical certainty, was blunt force trauma and asphyxiation. Dr. Chundru testified that the information about possible asphyxia, or lack of oxygen to the brain, made "perfect sense" because the blood loss from the head wound would have been insufficient itself to cause death. He further testified that although asphyxia can be caused in many ways, placing a pillow over someone's face leaves no evidence on the autopsy. He stated that asphyxia would also explain the presence of fluid in the lungs without any brain injury, as he had observed here.

**Hernandez's medical records**

During her case in chief, Preston offered Hernandez's medical records into evidence. The records showed that more than seven months before his death, Hernandez saw Dr. John Frederick for generalized anxiety and anger disorders. Dr. Frederick's notes of Hernandez's examination state that Hernandez had a pleasant demeanor and that he exhibited a normal mood/affect. Dr. Frederick's notes also conclude that Hernandez was calm and not a danger to himself or to others, and that Preston agreed. It was unclear whether data in other portions of the exhibit came from Hernandez himself or someone with him at the time.

At the conclusion of the trial, the jury convicted Preston of murder, and the court rendered judgment on that verdict. Preston filed a motion for new trial that was denied by operation of law. This appeal followed.

11

**DISCUSSION**

**Issue 1: No egregious harm from lack of instruction on use of deadly force in self-defense**

In her first issue, Preston complains that the district court did not give the jury an instruction on the use of deadly force in self-defense to prevent another person's "imminent commission" of kidnapping or murder. *See* Tex. Penal Code § 9.32(a)(2)(B) (justifying person's use of deadly force against another to prevent other person's imminent commission of certain offenses, including aggravated kidnapping or murder). Article 36.14 of the Texas Code of Criminal Procedure directs the trial judge to "deliver to the jury . . . a written charge distinctly setting forth the law applicable to the case." *Mendez v. State*, 545 S.W.3d 548, 551–52 (Tex. Crim. App. 2018); *Arteaga v. State*, 521 S.W.3d 329, 334 (Tex. Crim. App. 2017); *see* Tex. Code Crim. Proc. art. 36.14. The charge should include "all of the law applicable to the criminal offense that is set out in the indictment or information," and "general admonishments, including . . . the presumption of innocence, proof beyond a reasonable doubt, unanimity of the verdict, and so forth," which are "law applicable to the case." *Mendez*, 545 S.W.3d at 552. However, not every defense-benefitting instruction is "law applicable to the case," such that its exclusion from the charge is necessarily erroneous. *Id*.

We review claims of jury charge error under the test set forth in *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g), determining first whether error exists, then evaluating the harm caused by any error. *Arteaga*, 521 S.W.3d at 333; *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). A defendant's failure to object to jury-charge error affects which of the dual standards of review under *Almanza* is to apply. *Mendez*, 545 S.W.3d at 552. When—as

12

here—the defendant fails to object, reversal is warranted only upon a showing of "egregious harm" such that the defendant was deprived of "a fair and impartial trial." *Id*. Egregious harm is a "high and difficult standard" to meet, and it "must be borne out by the trial record." *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). We will not reverse a conviction without a showing of actual, not theoretical, harm. *Villarreal v. State*, 453 S.W.3d 429, 431 (Tex. Crim. App. 2015).

In her first issue, Preston complains that the trial court did not give the jury an instruction, sua sponte, under subsection (B) of 9.32(a)(2) of the Penal Code justifying a person's use of deadly force to prevent another's imminent commission of aggravated kidnapping or murder:

> A person is justified in using deadly force against another:
>
> > (1) if the actor would be justified in using force against the other under Section 9.31; and
> >
> > (2) when and to the degree the actor reasonably believes the deadly force is immediately necessary:
> >
> > > (A) to protect the actor against the other's use or attempted use of unlawful deadly force; or
> > >
> > > (B) to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

*See* Tex. Penal Code § 9.32(a). Both of these alleged offenses, based on the evidence at trial, required evidence of Hernandez's use or attempted use of deadly force. *See id*. §§ 19.02 (defining offense of murder), 20.01(2)(B) (defining "abduct" in aggravated kidnapping statute as restraint of

13

person with intent to prevent person's liberation by "using or threatening to use deadly force"[5]), 20.04 (defining offense of aggravated kidnapping).

The charge given to the jury included an instruction stating that a person's use of deadly force is justified to prevent the use or attempted use of unlawful deadly force by another.[6] That instruction is a correct statement of the law. *See id*. § 9.32(a)(2)(A); *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Criminal Defenses* CPJC 32.2 & cmt. (2015) (Instruction—Self-Defense Involving Deadly Force to Protect Against Deadly Force By Another; Relevant Statutes). Further, when an instruction that the trial court has not given to the jury is adequately covered by an instruction that was given, no harm is shown. *See Druery v. State*, 225 S.W.3d 491, 505 (Tex. Crim. App. 2007) (concluding that "when a refused charge is adequately covered by the charge given, no harm is shown"). We conclude that the instruction given to the jury was a correct statement of the law and that the instruction not given to the jury was adequately covered by the instruction that was given; thus, no error or harm is shown. Preston's first issue is overruled.

---

[5] Aggravated kidnapping is also defined as an abduction involving restraint of a person with intent to prevent liberation by hiding the person, but there was no evidence that Hernandez hid Preston or isolated her from an available person's help. *See* Tex. Penal Code §§ 20.01(2)(A), 20.04; *cf. Laster v. State*, 275 S.W.3d 512, 522–24 (Tex. Crim. App. 2009) (affirming defendant's aggravated kidnapping conviction after concluding that jury could infer his intent to secrete his victim when he pulled her away from her brother, who was her only available help).

[6] The court's instruction stated, "A person's use of deadly force against another that would otherwise constitute the crime of MURDER is not a criminal offense if the person reasonably believed deadly force was immediately necessary to protect the person against the other's use or attempted use of unlawful deadly force." *See* Tex. Penal Code § 9.32(a)(2)(A); *see also* Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Criminal Pattern Jury Charges: Criminal Defenses* CPJC 32.2 & cmt. (2015) (Instruction—Self-Defense Involving Deadly Force to Protect Against Deadly Force By Another; Relevant Statutes).

**Issue 2: No egregious harm from lack of instruction on presumption of reasonableness**

In her related second issue, Preston complains that the charge did not instruct the jury on the presumption of reasonableness as to her purported belief that the use of deadly force was immediately necessary. The presumption of reasonableness is set forth in section 9.32 of the Penal Code, which provides that an actor's belief that deadly force is immediately necessary is presumed reasonable if: (1) the actor did not provoke the person against whom the force was used; (2) the actor was not otherwise engaged in criminal activity, other than a class C misdemeanor traffic violation, at the time the force was used; and (3) the actor knew or had reason to believe that the person against whom the deadly force was used was committing or attempting to commit any of certain specified offenses, including—as Preston alleges here—aggravated kidnapping or murder. *See* Tex. Penal Code § 9.32(a)(2)(B), (b)(1)(C), (2), (3). The Penal Code "requires that a presumption that favors the defendant be submitted to the jury if there is sufficient evidence of the facts that give rise to the presumption . . . unless the court is satisfied that the evidence as a whole clearly precludes a finding beyond a reasonable doubt of the presumed fact." *Id*. § 2.05(b)(1); *Villarreal*, 453 S.W.3d at 431.

Determining whether charge error caused egregious harm to a defendant requires consideration of the factors set forth in *Almanza* : (1) the entirety of the jury charge, (2) the state of the evidence, including the contested issues and weight of probative evidence, (3) the arguments of counsel, and (4) any other relevant information revealed by the trial record as a whole. *Villarreal*, 453 S.W.3d at 433 (citing *Almanza*, 686 S.W.2d at 171). Our consideration of these factors, set forth below, persuades us that the lack of an instruction to the jury on the presumption of reasonableness did not cause Preston egregious harm.

15

### a. Entirety of jury charge

The district court's charge correctly instructed the jury on the elements of murder as charged in the indictment, provided relevant definitions and instructions on self-defense, and addressed the State's burden to disprove self-defense. The self-defense instructions correctly informed the jury of the general law of self-defense, including when the use of deadly force is justified under the statute, the definition of "reasonable belief," and the exclusion of conduct in response to verbal provocation alone. The jury was also instructed on the conditions in which a person has no duty to retreat before using deadly force. The jury was further instructed that if the State did not meet its burden of proving Preston guilty beyond a reasonable doubt, the jury should render a verdict of "not guilty."

Additionally, as noted in our discussion of Preston's first issue, the jury was provided with an instruction justifying a person's use of deadly force to prevent the use or attempted use of unlawful deadly force by another. *See* Tex. Penal Code § 9.32(a)(2)(A). The charge did not instruct the jury on the presumption of reasonableness in section 9.32(b) of the Penal Code as to a person's belief that the use of deadly force was immediately necessary. *See id.* § 9.32(b). But as the State points out, even if the presumption-of-reasonableness instruction had been given, the complete instruction would have allowed the jury to disregard that presumption if they concluded that the State met its burden of showing beyond a reasonable doubt that Preston had no reasonable belief, when she struck Hernandez, that he was in the imminent act of committing or attempting to commit murder or aggravated kidnapping. *See id.*; *Villarreal*, 453 S.W.3d at 442–43; *see also Raza v. State*, No. 05-17-00066-CR, 2018 Tex. App. LEXIS 1517, at *19–20 (Tex. App.—Dallas Feb. 27, 2018,

16

no pet.) (mem. op., not designated for publication); *Angton v. State*, No. 05-14-01038-CR, 2015 Tex. App. LEXIS 11548, at *11–12 (App.—Dallas Nov. 6, 2015). Whether the presumption was applicable here depended on the evidence at trial, including the plausibility of the evidence raising the issue self-defense. *See Villarreal*, 453 S.W.3d at 436; *see also Angton*, 2015 Tex. App. LEXIS 11548, at *12. Thus, we proceed to consider that evidence.

### b. State of the evidence

At trial, Preston's account of the events leading to Hernandez's death was that Hernandez followed her into their bedroom holding a knife sharpener, she got on the bed and began kicking him away from her, she kicked him in the middle of his stomach, he got on top of her in bed, then she "thinks" that she held a rock with both hands in an overhead arching motion and struck Hernandez, who hit his head on a window, fell on top of her, and died.

But the evidence presented to the jury was inconsistent with Preston's account of events and, as she acknowledged, "made no sense" for her claim that she killed Hernandez in self-defense. That evidence included:

- The testimony of Preston's son Griffin, who stated that his mother told him, "I killed Joe," that Hernandez was asleep when she hit him with a rock, that Hernandez came to and said "just finish me off," and that she then smothered Hernandez with a pillow;

- Griffin's statement to police that his mother panicked, told him not to say anything to anybody, and expressed concern about jail or the death penalty;

- Preston's testimony that she "must have" told Griffin those things;

- Preston's testimony that she moved Hernandez's body from the bed and also asked her son to help her move the body outside;

17

- Griffin's testimony that when his mother asked him to help move Hernandez's body outside, he was concerned that it was to cover up a murder;

- Griffin's testimony that he never saw Hernandez physically abuse his mother;

- Preston's testimony that she never called 911 for any abuse directed at her from Hernandez and never sought a protective order;

- Griffin's testimony that he told his mother to call the police or he would;

- Preston's testimony that she removed the mattress topper from the bed to a shed;

- Preston's testimony that she moved the rock she had used to kill Hernandez and placed it by his left hand on the floor of the bedroom;

- Preston's testimony that she moved the knife sharpener from the bedroom floor and took it back to the kitchen;

- Preston's testimony that she tried to put gasoline on Hernandez's body and burn it;

- Preston's acknowledgment that if she killed Hernandez in self defense, it did not make sense for her to alter the scene where she killed him or to burn his body;

- Preston's statement to police that she changed clothes two or three times before calling 911;

- Preston's testimony that she photographed some of her bruises with her phone minutes before calling 911;

- Preston's call to 911, the day after she killed Hernandez, requesting help for a fire in her house that she later tells the operator she has put out herself with a fire extinguisher;

- Preston's statement to the 911 operator that Hernandez "fell and hit his head on a rock . . . yesterday";

- Preston's testimony about her "aloof" attitude in her call with the 911 operator;

- Deputy Jowers's testimony that Preston told him Hernandez had "hit his head on a rock";

18

- Paramedic Woods's testimony that Preston told him about how colors reflected and "how cool it looked" when she sprayed gasoline from a Windex bottle on Hernandez's body in preparation for burning it;

- Woods's testimony that Preston said she called 911 because "[w]hen she lit [Hernandez] on fire the house began burning" and she wanted to save her house;

- Ranger Bobo's testimony and the medical examiner's testimony that Hernandez had no defensive wounds;

- Ranger Bobo's testimony that the left side of Hernandez's face and head were saturated with blood, but no blood was on Hernandez's neck, arms, forearms, hands or the upper part of his shirt, indicating that Hernandez had not been in an upright position at the time of his "bloodletting event" because blood would have been coming downward if he were in an upright position;

- Ranger Bobo's testimony that a blood smear on a window in the room where Hernandez was found would not have been caused by an upright person falling down and inward toward the window—as Preston theorized—because the smear was "going in the opposite direction";

- Ranger Bobo's testimony that the location of blood spatter on Preston's tank top and shorts recovered from her bathroom was inconsistent with someone being on top of another person;

- Ranger Bobo's testimony that the blood spatter located "kind of equally . . . across the window" indicated Hernandez's location when he was struck and was inconsistent with Hernandez having been seated on the bed, standing on the bed, or standing beside the bed when he was struck because no part of his body shielded the distribution of the blood from the window;

- Ranger Bobo's testimony, after examination of the blood spatter patterns and investigation of the crime scene, that Hernandez was in bed, lying on his back, unaware and still, when Hernandez was struck with a blunt instrument;

- Ranger Pena's testimony that the bedroom where Hernandez was found showed no signs of an altercation;

- The lack of Preston's DNA on the handle of the knife sharpener that she testified she picked up from the bedroom floor and took back to the kitchen;

19

- The lack of any statement by Hernandez to Preston indicating his intention to kill Preston or anyone else;

- The lack of any witness testimony attacking Griffin's credibility; and

- Preston's testimony that her actions after she killed Hernandez did not make any sense "as far as it being self-defense."

Preston's testimony on self-defense was weak in comparison with the evidence at trial contradicting her account of events. Even if the district court had included an instruction on the presumption of reasonableness in the charge, a rational jury presented with the evidence from this trial could have still rejected Preston's claim of self-defense and found beyond a reasonable doubt that: (1) Preston did not believe her use of deadly force was immediately necessary to protect herself from Hernandez's use or attempted use of unlawful deadly force for attempted aggravated kidnapping or attempted murder, or (2) Preston's belief that her use of deadly force was immediately necessary was unreasonable.

We conclude that there was no substantial risk that Preston was egregiously harmed by the lack of an instruction on the presumption of reasonableness and that it is unlikely the instruction would have changed the outcome, i.e., the jury's rejection of Preston's claim of self-defense. *See Villarreal*, 453 S.W.3d at 439; *see also Raza*, 2018 Tex. App. LEXIS 1517, at *19–20; *Angton*, 2015 Tex. App. LEXIS 11548, at *10–16; *McClesky v. State*, 224 S.W.3d 405, 409–10 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (affirming murder conviction of wife who claimed self-defense and noting that her testimony was only evidence suggesting that her husband was aggressor on day of events leading up to his murder). Accordingly, this factor weighs against a determination that Preston sustained egregious harm.

20

### c. Arguments of counsel

Counsels' arguments to the jury show that both parties focused primarily on whether Preston acted in self-defense. The State argued that the jury should reject Preston's claim of self defense as contrary to the evidence and not credible. The defense argued that the State failed to disprove Preston's claim of self-defense and that the evidence did not support the State's theory of how Hernandez was killed. Neither of them centered their arguments on whether Preston reasonably believed that deadly force was immediately necessary. *See Villarreal*, 453 S.W.3d at 44–42.

The prosecutor's opening statement contended that the evidence would show Preston murdered Hernandez, "cold-bloodedly" and "utterly without remorse or sorrow." After summarizing the testimony of the witnesses he expected to call, the prosecutor stated that "heat of passion and self defense are not issues that arise from this type of fact pattern." By contrast, defense counsel's opening statement contended that Preston killed a man who was beating her, which explained her attitude, demeanor, and lack of remorse after Hernandez's death. After summarizing what he expected the evidence to show, defense counsel said that the State would be unable to prove that "it happened the way that they say it happened." Defense counsel told the jury multiple times during his opening that the evidence would not support the prosecution's theory that Hernandez was killed in his sleep.

Closing argument by the prosecutor focused primarily on the amount of evidence contradicting Preston's claim of self-defense—including the physical evidence, forensic testimony, and her son's testimony—and Preston's lack of credibility—including her own inconsistent statements to first responders that Hernandez had hit his head on a rock and that she had hit him with

21

a rock. The prosecutor contended that Preston was not credible—"Her testimony has been so impeached that you cannot believe one thing that she said"—but that her son was credible—"You have no reason to disbelieve anything that that boy said. He absolutely told the truth to you." The prosecutor stated that as part of her self-defense claim, Preston testified she was in fear for her life, but he noted that the photographs in evidence showed no defensive marks or wounds suggesting that a reasonable person would have such fear and that Preston's reluctance to call 911 after Hernandez's death was more consistent with "cold-blooded murder." The prosecutor concluded that, "it comes down to what you heard from the State's case and what you heard from the defendant." He said that the overwhelming evidence proved "the guilt of the defendant in the intentional murder of Joe Hernandez and that self-defense, anything alleged or raised in self-defense, does not hold water."

Closing argument by defense counsel focused on his contention that the State had not met its burden of disproving Preston's claim of self-defense. Toward the end of his closing, he asked the jury a question about Preston's belief that she was going to be hurt: "So did she reasonably believe that she was going to be hurt using deadly conduct? Has anybody ever been beaten with a thing like that? Probably not." But the majority of his closing was spent on matters he characterized as "very, very relevant": the absence of blood spatter from a fan in the bedroom, an alternative scenario for the blood smear and blood drop on the window, and the bruising shown in photographs of Preston. Defense counsel minimized the "blank spots" in Preston's memory, stating that "violent situations do unusual things to people's minds" and that, "[w]hen she testified, I didn't like a word she said, frankly. I didn't like the attitude she had, but I did understand . . . how a person who had gone through what she had gone through, okay, could have problems remembering with particularity

22

the things that happened on those days." Defense counsel also minimized Griffin's testimony by noting that "16-year-olds say things when they're upset and they get stuck with those statements after they make them to police."

We conclude that the focus of counsels' arguments to the jury, before and after the presentation of the evidence, weigh against a determination that the lack of an instruction on the presumption of reasonableness caused Preston egregious harm. *See Villarreal*, 453 S.W.3d at 441–42; *see also Angton*, 2015 Tex. App. LEXIS 11548, at *15–16.

### d. Other relevant information from trial record

The last *Almanza* factor requires consideration of any other relevant information revealed by the record as a whole. *See Villarreal*, 453 S.W.3d at 433 (citing *Almanza*, 686 S.W.2d at 171). However, we have considered the relevant information from the trial record in our discussion of the three preceding factors.

After considering all the *Almanza* factors, we conclude that the lack of an instruction on the presumption of reasonableness did not cause Preston egregious harm. *See id*. We overrule Preston's second issue.

**Issue Three:   No egregious harm as to instruction that self-defense requires more than verbal provocation**

In her third issue, Preston complains about the inclusion of an instruction in the charge—to which she did not object below—stating that self-defense requires more than verbal provocation. As noted above, we review claims of jury charge error under the test set forth in *Almanza*, determining first whether error exists, then evaluating the harm caused by any error.

686 S.W.2d at 171; *Arteaga*, 521 S.W.3d at 333; *Ngo*, 175 S.W.3d at 743. When, as here, the defendant fails to preserve error by timely objection at trial, reversal is warranted only upon a showing of "egregious harm" such that the defendant was deprived of "a fair and impartial trial." *Mendez*, 545 S.W.3d at 552.

Here, Preston contends that she was egregiously harmed by the last paragraph of the court's instruction on self-defense, which states: "Self-defense does not cover conduct in response to verbal provocation alone. The defendant must have reasonably believed the other person had done more than verbally provoke the defendant." Preston's view is that this instruction "was a non-statutory expansion of provocation, and thus, a prohibited comment on the weight of the evidence." She relies on *Walters v. State*, 247 S.W.3d 204 (Tex. Crim. App. 2007), in which the Court of Criminal Appeals concluded that the trial court did not err by refusing Walters's request to instruct the jury that it could consider "prior verbal threats" in deciding whether he acted in self-defense. *Id*. at 214. The Court held that parties are not entitled to any special, non-statutory jury instructions on how to consider or evaluate specific types of evidence introduced to prove or disprove self-defense. *Id*. (noting that "[n]ormally, if the instruction is not derived from the code, it is not 'applicable law'").

However, the court's instruction here is derived from the Penal Code. Subsection 9.31(b)(1) of the Code states that, "The use of force against another is not justified: (1) in response to verbal provocation alone[.]" Tex. Penal Code § 9.31(b)(1). The court's instruction is taken verbatim from the instruction on self-defense in the Texas Criminal Pattern Jury Charges, which is based on section 9.31. *See Texas Criminal Pattern Jury Charges: Criminal Defenses* CPJC 32.2 &

24

cmt. Unlike the "prior verbal threats" referenced by the defendant's proposed instruction in *Walters*, this instruction does not allude to any particular type of evidence; rather, it recites a correct statement of the law of self-defense from the Penal Code. *Cf. Walters*, 247 S.W.3d at 214 (noting that defendant's proposed instruction focused jury's attention on specific type of evidence that he claimed made victim's actions appear dangerous to him); *see Allen v. State*, No. 03-15-00420-CR, 2017 Tex. App. LEXIS 3938, at *10–11 (Tex. App.—Austin May 2, 2017, pet. ref'd) (mem. op., not designated for publication) (rejecting defendant's contention that court commented on weight of evidence by including jury instruction on "verbal provocation alone"); *Castillo v. State*, No. 14-03-00034-CR, 2005 Tex. App. LEXIS 1382, at *33–35 (Tex. App.—Houston [14th Dist.] Feb. 15, 2005, pet. ref'd) (mem. op., not designated for publication) (same).

We conclude that the instruction provided to the jury was not a "non-statutory" instruction, did not constitute a comment on the weight of any particular evidence, and did not cause Preston egregious harm such that she was deprived of a fair and impartial trial. *See Mendez*, 545 S.W.3d at 552; *see also Allen*, 2017 Tex. App. LEXIS 3938, at *10–11; *Castillo*, 2005 Tex. App. LEXIS 1382, at *33–35. We overrule Preston's third issue.

**Issue Four: No abuse of discretion and no harm from denial of additional instruction on State's burden to disprove self-defense**

In her fourth issue, Preston complains that the court denied her request for an additional instruction in the charge as to the State's burden to disprove self-defense. Specifically, she challenges the district court's denial of her requested instruction that would have added the underlined part of this phrase to the Verdict section of the charge: "The verdict of 'not guilty' simply

means that the State's evidence does not prove the defendant guilty beyond a reasonable doubt, <u>OR that the State failed to prove, beyond a reasonable doubt, that self-defense did not apply</u>."

We review a trial court's denial of a requested jury instruction for an abuse of discretion. *See Wesbrook v. State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000); *see also Luper v. State*, No. 05-13-01259-CR, 2014 Tex. App. LEXIS 12007, at *4–5 (Tex. App.—Dallas Oct. 31, 2014, no pet.) (mem. op., not designated for publication). A trial court does not abuse its discretion if its decision is within the zone of reasonable disagreement. *See Casey v. State*, 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *see also Luper*, 2014 Tex. App. LEXIS 12007, at *5. When reviewing claims of jury-charge error, we first determine whether an error exists in the charge. *Arteaga*, 521 S.W.3d at 333. If the refused charge is adequately covered by the charge given, no harm is shown. *Druery*, 225 S.W.3d at 505; *Stevens v. State*, 671 S.W.2d 517, 522 (Tex. Crim. App. 1984) (concluding that no harm was shown by trial court's refusal of defendant's requested charge because it was substantially same as charge given by court).

Here, as the State correctly notes, the Self-Defense Burden of Proof section of the charge included an instruction stating, "The defendant is not required to prove self-defense. Rather, the [S]tate must prove, beyond a reasonable doubt, that self-defense does not apply to the defendant's conduct." This tracks the burden-of-proof instruction for a claim of self-defense as set forth in the Texas Criminal Pattern Jury Charges. *See Texas Criminal Pattern Jury Charges: Criminal Defenses* CPJC 32.2; *see also* Tex. Penal Code § 2.03(d) ("If the issue of the existence of a defense is submitted to the jury, the court shall charge that a reasonable doubt on the issue requires that the defendant be acquitted.") During the charge conference below, Preston acknowledged that

26

an appropriate instruction was already in the charge, and the court determined that the requested instruction was unnecessary:

> [Defense counsel]: Now, it also cannot be ignored that in other sections of the charge the appropriate burdens are discussed, and I believe that to be appropriate; however, if—I'd like to be consistent throughout this charge, and, as such, I'm asking the judge to—the Court to what I would call remedy this section of the proposed jury charge. That's my request, Judge.
>
> . . . .
>
> THE COURT: All right. I'm going to—from my review of the proposed instructions, it appears to be very clear that the State has the burden of disproving self-defense beyond a reasonable doubt and I don't believe that the proposed language is necessary. The language that is included is simply part of the form language that we use in all of the cases. Obviously, counsel for the defense is able to point out the other portions of the instructions that deal with self-defense and the burden being on the State to disprove self-defense beyond a reasonable doubt, so I'm not going to change the language of these instructions to include the proposed language that you've read into the record.
>
> [Defense counsel]: Thank you, Judge.

Preston's requested instruction—stating that she could be found not guilty if the State failed to prove, beyond a reasonable doubt, that her claim of self-defense did not apply—is substantially the same as the instruction given by the court explaining that it was the State's burden to disprove, beyond a reasonable doubt, Preston's claim of self-defense. Accordingly, we conclude that no abuse of discretion and no harm is shown by the denial of Preston's requested additional instruction. *See Wesbrook*, 29 S.W.3d at 122; *Stevens*, 671 S.W.2d at 522. We overrule Preston's fourth issue.

27

**Issue Five:  No abuse of discretion in admission of blood-spatter testimony**

In her fifth issue, Preston complains of the admission of blood-spatter testimony from Ranger Bobo.  Specifically, she complains that the officer provided speculative testimony by stating that a blood smear on the window was "most likely caused" by a foam mattress top.

At the outset, we note that it is unclear whether Preston preserved this issue for appellate review.  To preserve error for appellate review, a party must make a timely and specific objection at the earliest possible opportunity and obtain an adverse ruling from the trial court, and the complaint on appeal must correspond to the objection made at trial.  *Yazdchi v. State*, 428 S.W.3d 831, 844 (Tex. Crim. App. 2014); *see* Tex. R. App. P. 33.1(a).  A party may object to expert opinion on at least three specific grounds: (1) qualification, (2) reliability, and (3) relevance.  *Shaw v. State*, 329 S.W.3d 645, 655 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd); *see Crider v. State*, No. 11-16-00302-CR, 2018 Tex. App. LEXIS 2285, at *15 (Tex. App.—Eastland Mar. 30, 2018, no pet.) (mem. op., not designated for publication).  Qualification, reliability, and relevance raise distinct questions and issues, and a party's objection based on one of these grounds does not preserve error as to another.  *Shaw*, 329 S.W.3d at 655; *see Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (noting that witness's qualifications as expert are distinct from reliability and relevance and should be evaluated independently); *see also Crider*, 2018 Tex. App. LEXIS 2285, at *15 (concluding that defendant failed to preserve her complaint about reliability of experts' opinions).  Preston made none of these objections below.

At trial, outside the jury's presence, counsel and the court discussed Ranger Bobo's opinion about the blood smear on a window in Preston's bedroom:

28

THE COURT: Back on the record. And at this point then Ms. Preston is present in the courtroom. Counsel is present. State is present. And I believe that the question was asked based on your training and experience what you believe the cause of the pattern of the blood on the window shown in the State's Exhibit . . . 149, what the cause was. And counsel for the defense asked to approach [the bench] . . . and instead of taking the witness on voir dire, instead asked what the answer to that question would be. So if you're asked that question, what is your answer going to be?

[Ranger Bobo]: Well my answer is going to be obviously a movement through deposited blood on there. And when you talk about the object and the object specifically it's most probably—

[Court reporter interrupts briefly because of difficulty hearing the witness.]

Okay. Obviously there's movement through blood. That's clear and apparent. Deposited blood that was prior—previously there. When talking about the object of what moves through there it appears like a pattern transfer or a swipe most likely caused from the foam mattress atop—the mattress that was removed from the scene.

[Defense counsel]: All right. I don't have any objection to that, except for the last part about assuming that it's the foam mattress. That would be my objection.

THE COURT: Okay. Well, your objection is overruled then. You can cross-examine the witness about his response, but based on the evidence that's been admitted at this time, along with the photos that show the foam mattress topper, or whatever we're calling it, it clearly shows blood on the top of that mattress. That's a—based on training and experience that's a reasonable . . . plausible . . . explanation, but, clearly, you have an opportunity to cross-examine the witness as to what the basis for that belief is going to be.

[Defense counsel]: All right.

29

Defense counsel's statement that he had no objection—"except for the last part about assuming that it's the foam mattress. That's my objection"—was no objection at all. Ranger Bobo never stated that he was "assuming" anything. We are not persuaded that Preston preserved her appellate complaint as to the admission of speculative testimony. *See* Tex. R. App. P. 33.1; *Yazdchi*, 428 S.W.3d at 844 (concluding that complaint on appeal must correspond to objection made at trial).

Even if Preston had preserved her complaint, we cannot agree that Ranger Bobo's testimony about the cause of the blood smear on the window should have been excluded as speculation. Relying on *Carter v. Steere Tank Lines, Inc.*, Preston contends that Ranger Bobo "was not present when the blood was deposited," and "he was not in a position to observe what happened, thus his testimony was inadmissible speculation." *See* 835 S.W.2d 176 (Tex. App.—Amarillo 1992, writ denied). In *Carter*, appellants challenged a take-nothing judgment in their wrongful death lawsuit arising from a traffic accident. *Id.* at 177. A harmless error discussed in the appeal was the trial court's admission of deposition testimony from a witness, who was 500 or 600 feet away from the accident scene, concerning the absence of obstructions that would have prevented the driver of a vehicle from seeing the truck that he hit. *Id.* at 183–85 (noting that it was unclear whether witness was in position to observe what driver had observed and that objection to speculation should have been sustained). *Carter* lends no support to Preston's view that a Texas Ranger's testimony about blood spatter—such as the cause of blood smeared on a window at a crime scene—is speculative unless he was present when the blood was deposited and watched it happen.

Next, Preston complains that the trial court found Ranger's Bobo's explanation about the blood smear "plausible," which in her estimation meant the testimony was "in the realm of mere

30

theorizing, guessing, and speculation." She contends that her "self-defense account" of events, which "allowed an inference that the smear was caused by Hernandez's fall" after their physical struggle—was undermined by Ranger Bobo's opinion that Hernandez was struck while lying down motionless in bed.[7] We review the trial court's admission of expert testimony under an abuse of discretion standard, reversing the ruling only if the decision is outside the zone of reasonable disagreement. *Blasdell v. State*, 470 S.W.3d 59, 62 (Tex. Crim. App. 2015). Here, Preston contends only that Officer Bobo's testimony was "speculative" under Texas Rule of Evidence 703.

Under the Texas Rules of Evidence, expert testimony is admissible when the trial court is satisfied that: (1) the expert is qualified by knowledge, skill, experience, training, or education; (2) the subject of the testimony is appropriate for expert testimony; and (3) the testimony will assist the trier of fact in deciding the case. Tex. R. Evid. 702; *Alvarado v. State*, 912 S.W.2d 199, 215–16 (Tex. Crim. App. 1995); *see De Leon v. State*, No. 04-04-00883-CR, 2006 Tex. App. LEXIS 813, at *6 (Tex. App.—San Antonio Feb. 1, 2006, pet. ref'd) (mem. op., not designated for publication). The special knowledge qualifying a witness to give an expert opinion may be derived from specialized education, practical experience, a study of technical works, or a varying combination of these things. Tex. R. Evid. 702; *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App. 2000).

---

[7] We note that Preston's son Griffin provided the jury with essentially the same information contradicting his mother's claim of self-defense when he testified—without objection—that she told him Hernandez was asleep in bed when she hit him on the head with a rock and killed him. *See Mack v. State*, 928 S.W.2d 219, 225 (Tex. App.—Austin 1996, pet. ref'd) (no reversible error presented if other evidence at trial is admitted without objection proving same fact or facts that allegedly inadmissible evidence sought to prove).

Rule 702 allows "a witness qualified as an expert by knowledge, skill, experience, training, or education" to give opinion testimony based on "scientific, technical, or other specialized knowledge." Tex. R. Evid. 702. Rule 703 specifies the bases on which an expert may base his testimony—stating that an expert may base an opinion on facts or data in the case that the expert has been made aware of, reviewed, or personally observed—and that the facts or data need not be admissible for the opinion to be admitted if experts in the particular field would reasonably rely on those kinds of facts or data. Tex. R. Evid. 703. An expert's opinion must be more than "subjective belief or unsupported speculation," but it need not reach the level of "known to a certainty" to be admissible. *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993); *see also Hernandez v. State*, No. 03-04-00356-CR, 2006 Tex. App. LEXIS 722, at *8–9 (Tex. App.—Austin Jan. 26, 2006, pet. ref'd) (mem. op., not designated for publication). "Generally, blood spatter experts inspect the physical evidence to determine the injuries suffered and their location with respect to the other physical evidence." *Ex parte Mowbray*, 943 S.W.2d 461, 462 (Tex. Crim. App. 1996).

Preston contends that Ranger Bobo's testimony was "mere theorizing, guessing, and speculation," but the trial record supports a conclusion that it was based on the evidence in the case that he had been made aware of, reviewed, or personally observed. *See* Tex. R. Evid. 703. After summarizing his qualifications[8]—including a crime-scene-investigator certification held by only 67

---

[8] Preston made no challenge to Ranger Bobo's qualifications. *See Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006) (noting that witness's qualifications as expert are distinct from reliability and relevance issues and should be evaluated independently); *see also Crider v. State*, No. 11-16-00302-CR, 2018 Tex. App. LEXIS 2285, at *15 (Tex. App.—Eastland Mar. 30, 2018, no pet.) (mem. op., not designated for publication) (concluding that defendant failed to preserve her complaint about reliability of experts' opinions).

people in Texas and his completion of 80 hours of blood-spatter training between the Texas Ranger service and the National Forensic Academy—Ranger Bobo directed the jury's attention to photographs admitted into evidence. The photographs showed the blood-stained window next to a bed in the master bedroom where Hernandez's body was found. Portions of the window were marked with numbered cards showing the locations of blood evidence.

Using the photographs, Ranger Bobo identified specific characteristics of the blood on the window that informed his opinion about how the blood was deposited. He testified that the window location marked with card 19 was a "pattern transfer" showing that "blood is being moved," "being swiped after it's been deposited." He noted that the blood was reddish brown, looked "a little bit hazy," and had "some striations in it indicating movement." He explained that the blood smear provided "directionality" that was not supported by someone falling down and inward toward the window—as Preston theorized—because "it's going in the opposite direction." He also explained that the blood smear became thinner as the source of the blood got farther away. Officer Bobo contrasted the blood smear at card 19 with the blood drip located at card 18, which was affected by "the downward pull of gravity."

Further, Ranger Bobo testified that the blood spatter on the window indicated where Hernandez was when Preston struck him. Ranger Bobo stated that if Hernandez had been seated on the bed, standing on the bed, or standing beside the bed when he was struck and bled, his body would have shielded the blood from going backward, and the blood spatter would have been unable to reach the "target" wall and window. This would have resulted in a blood-spatter "void"—not "a direct outline of somebody," but "an apparent absence of blood in a certain area because of that, because

33

of an intermediary target or person." Given the blood's location "kind of equally . . . across the window," Ranger Bobo testified that he could deduce Hernandez's location when was struck. He concluded that Hernandez was lying down on his back in the bed when Preston hit him.

Based on the blood-spatter information, Ranger Bobo opined that the most likely and probable source of the blood smear on the window was the foam mattress topper that was on the bed:

> [Prosecutor:] All right. Now, I had asked you—right before the court took a 15-minute recess I asked you what—if you had an opinion based on your experience and training as to what that—and forgive me if I'm not using the same terminology as you—what that smear was caused by, and you said you did you have an opinion on what you thought it was. And would you go ahead and express that to the ladies and gentlemen of the jury?

> [Ranger Bobo:] My opinion on what this is would be a pattern transfer. Basically blood—blood is being moved. It's being swiped after it's been deposited. And the object—is that what we're talking about?

> [Prosecutor:] Yes.

> [Ranger Bobo:] The object specifically, as far as probability and most likely, and from a million other things, is going to be the foam mattress that was—that was situated atop this mattress when this event unfolded.

We conclude that the district court could have reasonably determined that Ranger Bobo's expert testimony—which the court found was based on his training and experience—was not "mere theorizing, guessing, and speculation," that blood-spatter analysis was an appropriate subject of expert testimony, and that his testimony would provide the jury with specialized knowledge that would assist them in understanding the evidence or in determining a fact in issue. *See* Tex. R. Evid. 702; *Alvarado*, 912 S.W.2d at 215–16; *see also De Leon*, 2006 Tex. App. LEXIS 813, at *6–7; *cf.*

34

*Maxwell v. State*, No. 06-12-00194-CR, 2014 Tex. App. LEXIS 1514, at *5 (Tex. App.—Texarkana Feb. 12, 2014, no pet.) (mem. op., not designated for publication) (noting detective's conclusion that "extreme amount of force [was] applied to something with blood" given "mostly high velocity" blood spattered around headboard of bed at crime scene); *Holmes v. State*, 135 S.W.3d 178, 197 (Tex. App.—Waco 2004, no pet.) (Vance, J., concurring) (concluding that trial court did not err in admitting detective's testimony on blood-spatter analysis, including his opinion that "blood found on walls and a sofa probably got there from a wound gushing blood" or was deposited "when the body thrashed around, [and] the blood flew to the walls and sofa"). Accordingly, the trial court did not abuse its discretion by admitting Ranger Bobo's testimony about blood spatter. We overrule Preston's fifth issue.

**Issues Six and Seven: No abuse of discretion in admission of two autopsy photographs**

In her sixth and seventh issues, Preston contends that the district court abused its discretion by admitting Exhibits 132 and 133, two of the nine 8 x10 color photographs that were authenticated by the medical examiner and that depict Hernandez's head, face, and unclothed upper body. Preston contends that the photographs were cumulative and that they were more prejudicial than probative under Texas Rule of Evidence 403.

Rule 403 requires that a photograph have some probative value and that its probative value not be substantially outweighed by a danger of unfair prejudice. Tex. R. Evid. 403; *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009). Rule 403 favors admission of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial. *Shuffield v. State*, 189 S.W.3d 782, 787 (Tex. Crim. App. 2006). A court may consider various

factors in determining whether the probative value of photographic evidence is outweighed by its prejudicial effect, including the number of exhibits offered, their gruesomeness, their detail, their size, whether they are in color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case. *Williams*, 301 S.W.3d at 690. Admissibility of photographs is within the sound discretion of the trial judge, and we will not disturb the trial court's decision unless it falls outside the zone of reasonable disagreement. *Young v. State*, 283 S.W.3d 854, 874–75 (Tex. Crim. App. 2009). Autopsy photographs are generally admissible unless they depict mutilation of the victim caused by the autopsy itself. *Rojas v. State*, 986 S.W.2d 241, 249 (Tex. Crim. App. 1998); *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Crim. App. 1997).

Here, the complained-of photographs did not depict mutilation of Hernandez caused by the autopsy itself. Further, both photographs helped to explain and support witness testimony, and they were not cumulative as they showed different angles and perspectives of the injuries that Preston inflicted on Hernandez. Dr. Chundru, the medical examiner who conducted Hernandez's autopsy, testified that Exhibit 133 provided a comprehensive view of Hernandez's entire face and his injury. Dr. Chundru noted that Hernandez's bloated appearance, as depicted in this photo, was a sign of the body's decomposition, which was accelerated due to the heat of being burned. Additionally, Dr. Chundru stated that he examined all of Hernandez's external body for signs of assault or struggle, and that he looked for any defensive wounds but found none. Exhibit 132 provided a view of Hernandez's chest from mid-abdomen up and the burn marks on it—illustrating Ranger Bobo's testimony that the burns to Hernandez's body were "plain and obvious"—which no

36

other photograph in evidence depicted. Moreover, this photograph does not show any bruise or mark indicating that Hernandez sustained a kick to the middle of his stomach, as Preston testified she had done. Even if the photographs were "disturbing," as Preston contends, the Court of Criminal Appeals has concluded that a trial court does not abuse its discretion simply by admitting into evidence a photograph that is gruesome or disagreeable to view. *Sonnier v. State*, 913 S.W.2d 511, 519 (Tex. Crim. App. 1995) (noting that although photographs of victims' bodies were gruesome or "disagreeable to look at," they depicted "nothing more than the reality of the brutal crime committed" and "when the power of the visible evidence emanates from nothing more than what the defendant has himself done we cannot hold that the trial court has abused its discretion merely because it admitted the evidence").

Relying on *Erazo v. State*, Preston contends that these two photographs "had little probative value in relation to the offense charged" because it was undisputed that she caused Hernandez's death. *See* 144 S.W.3d 487 (Tex. Crim. App. 2004). However, contrary to Preston's contention, *Erazo* supports the admission of these autopsy photographs. In *Erazo*, the court held that an autopsy photograph should have been excluded because it depicted a fetus whose death the defendant was not on trial for, not the actual victim. *Id*. at 494. Here, the autopsy photographs were of Hernandez, the person Preston was on trial for murdering. Further, *Erazo* noted that the admission of autopsy photographs in other cases properly "aid[ed] the jury in understanding the medical examiner's testimony about the victim's wounds" and were helpful "because they showed wounds suffered by the victim (or victims) for whose death the defendants were on trial." *Id*.; *see also Theisen v. State*, No. 04-13-00637-CR, 2014 Tex. App. LEXIS 11128, at *8–9 (Tex.

App.—San Antonio Oct. 8, 2014, pet. ref'd) (mem. op., not designated for publication) (concluding that *Erazo* negated defendant's argument that autopsy photograph of victim should have been excluded).

Preston failed to show that the district court's decision to admit these photographs into evidence was outside the zone of reasonable disagreement, and we conclude that the court did not abuse its discretion by determining that the probative value of the photographs was not substantially outweighed by a danger of unfair prejudice. Preston's sixth and seventh issues are overruled.

## CONCLUSION

We affirm the district court's judgment of conviction.

_____

Jeff Rose, Chief Justice

Before Chief Justice Rose, Justices Field and Bourland

Affirmed

Filed: July 18, 2018

Do Not Publish